## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Gregory Parrott, being duly sworn, depose and state that:

## INTRODUCTION

1.      I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – five cellular telephones and one laptop computer – as described in Attachment A - that is currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2.      I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2020.  I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. I have been a police officer with the Lansing Police Department for approximately 19 years, 3 of which I was assigned as an investigator with the Lansing Police Special Operations Section (SOS), which is tasked with investigating narcotics trafficking.  During my time as a SOS Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and also made several narcotic purchases in an undercover role. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such

drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

3.     I respectfully submit that there is probable cause to believe that Darniko Raynal Terry has engaged in the distribution of, and in the possession with intent to distribute, cocaine and crack cocaine,. I also submit there is probable cause he has possessed firearms and ammunition despite his status as a felon, contrary to 18 U.S.C. § 922(g)(1).  I further submit that there is probable cause to believe that evidence of these offenses will be found on the Devices described in Attachment A.

4.     The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses.  This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     This continuation supports the application of the warrants to search the property — five cellular telephones and one laptop computer – currently in the possession of law enforcement, hereinafter collectively referred to as "the **Devices**":

- **Device 2** – Green Apple iPhone with black case and unknown phone number. Lansing Police Department evidence #41.

- **Device 3** – Black Samsung phone with black case, unknown phone number. Lansing Police Department evidence #42.

- **Device 4** – Black Allcatel flip phone, unknown phone number. Lansing Police Department evidence #43.

- **Device 5** – Blue and Black Samsung phone, unknown phone number. Lansing Police Department evidence #44.

- **Device 6** – Red Lenovo Laptop computer. Lansing Police Department evidence #45.[1]

6.     The **Devices** are currently located at the Lansing Police Department (5815 Wise Rd, Lansing, MI, 48911). The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.  State and local officials are already in the process of performing data extractions on the devices pursuant to a state search warrant.  I have not reviewed the results of those extractions.  The

---

[1] The five Devices identified in this continuation, as well as in Attachment A, are designated Devices 2 through 6 to maintain consistency with how the Devices are discussed in corresponding investigative reports.  Device 1 is not at issue in this Search Warrant.

purpose of this affidavit is to establish probable cause to search the devices for evidence of the above-mentioned federal criminal offenses.

## PROBABLE CAUSE

7.      In October of 2020, the Lansing Police Department (LPD) Special Operations Section (SOS) was investigating suspected drug trafficking in the controlled substance of crack cocaine from and within 5017 Conners Ave Lansing Michigan 48911.

8.      On October 2nd, 2020, LPD SOS Officer Tim Martin observed a brown Granger trash outside near the curb and roadway in front of 5017 Conners Ave Lansing MI 48911. Other trash containers were placed in similar positions throughout the neighborhood. LPD SOS Officer drove to 5017 Conners Ave in an unmarked vehicle. The rear of the vehicle did not contain any trash bags. LPD SOS Officer Tim Martin removed three trash bags and some additional refuse from inside the brown Granger trash container next to the roadway / curb in front of 5017 Conners Ave Lansing MI 48911.

9.      LPD SOS Officer Tim Martin and LPD SOS Officer Jenniane Maatman searched through the three trash bags and refuse. LPD SOS Officer Tim Martin located eight plastic bags which were swiped using the NARK cocaine ID Swipe and each tested positive for cocaine. LPD SOS Officer Tim Martin also located residence paperwork for Darniko Terry at 5017 Conners Ave Lansing MI 48911.

10.     On October 6th, 2020, LPD SOS Officer Tim Martin continued his narcotics investigation of Darniko Terry and 5017 Conners Ave Lansing MI 48911. He supervised the follow controlled purchase of a quantity of cocaine:

    A.   On October 6th 2020 LPD SOS Officer met with LPD SOS Controlled Source (CS) #3014 at a pre-determined location. CS #3014 was searched and found to be free of both controlled substances and United States Currency.

    B.   LPD SOS Officer Tim Martin provided CS #3014 with United States Currency belonging to the LPD SOS for the purpose of purchasing the controlled substance crack cocaine.

    C.   CS #3014 was transported to a predetermined location in a vehicle known by LPD SOS Officer Tim Martin to be free of controlled substances.

    D.   LPD SOS observed a black male wearing a white and black shirt exit the east facing door of 5017 Conners Ave Lansing MI and enter the driver seat of a 2019 Grey Ford Escape MI registration EBT1695 The male then drove directly to the predetermined location where CS #3014 was located.  The male was short  (less than 6 feet tall) and heavyset, appearing overweight.

    E.   CS #3014 met with the black male driving the 2019 Grey Ford Escape MI registration EBT1695 and provided the black male with LPD SOS pre-recorded US Currency in exchange for suspected crack cocaine. CS

#3014 then left the area and made no stops and had no other contacts before meeting with LPD SOS Officer Tim Martin at a predetermined location.

F.  CS #3014 provided LPD SOS Officer Tim Martin with the suspected crack cocaine LPD SOS Officer Tim Martin conducted a TruNarc test of the substance which resulted positive for cocaine. LPD SOS Officer Tim Martin again search CS #3014 and found CS #3014 to be free of both controlled substance and United States currency.

G.  LPD paid $100 to CS #3014 for participating in this controlled purchase.

11.     Based in part on the above facts, on October 6th, 2020, LPD SOS Officer Tim Martin obtained a State of Michigan Search Warrant signed by Judge Louise Alderson for 5017 Conners Ave Lansing MI, Darniko Raynal Terry DOB 12/8/92 and a 2019 Grey Ford Escape Michigan registration EBT1695.

12.     On October 6th, 2020, LPD SOS Officers were conducting surveillance of 5017 Conners Ave Lansing Michigan in preparation of executing the above-mentioned State of Michigan Search Warrant. LPD SOS Officers observed Darniko Raynal Terry exit the residence and leave in a 2019 Grey Ford Escape MI registration EBT1695. Lansing Police Department Violent Crime Initiative (VCI) conducted a stop of Darniko Raynal Terry in the 2019 Grey Ford Escape MI registration EBT1695 a few blocks from the residence on Anson near Sumpter in Lansing Michigan 48911. LPD VCI located and secured Darniko Raynal Terry who

was the sole occupant and driver of the vehicle. LPD VCI Officer Waldrop conducted a search of Darniko Raynal Terry and 2019 Grey Ford Escape MI registration EBT1695 based on the signed State of Michigan search warrant. Officer Waldrop located and seized **Device 2** and **Device 3** on Darniko Terry's person. Officer Waldrop located and seized **Device 4** and **Device 5** inside the 2019 Grey Ford Escape MI registration EBT1695.

13.     On October 6th, 2020 LPD SOS executed State of Michigan Search Warrant at 5017 Conners Ave Lansing Michigan.   Officers found the following evidence:

   a.     <u>In the northeast bedroom</u>, officers found:

- A Glock 19 9mm handgun;

- a box of Federal 10mm ammunition containing 18 unspent rounds;

- $10 in cash on a dresser;

- $87 in case in a dresser drawer;

- $614 in cash in the pants pocket of men's jeans (size 42 in. X 33 in.) (note: these jeans look like they would fit Darniko Terry, who is approximately 5 feet 7 inches tall and weighs approximately 200 pounds; Terry himself is consistent in appearance and body type with the person who distributed the cocaine to the CS in the controlled purchase described above);

- Men's underwear;

- A Firekeepers Casino reward card with Darniko Terry's name on the front;

- Mail addressed to Darniko Terry and Jarreka Rutledge;

- Device 6, a laptop computer.

- (Note: Jarreka Rutledge told officers that she and Darniko Terry share the northeast bedroom.)

b.   <u>In the southwest bedroom</u>, officers found:

- an empty PMAG 20-round magazine for 5.56mm rifle ammunition.

c.   <u>In a hallway closet</u>, officers found:

- $6,000 in cash, bundled with rubber bands into three stacks of $2,000 each; and

- Board of Water and Light correspondence addressed to Darniko Terry at 5017 Conners Ave.

d.   <u>In the kitchen</u>, officers found:

- approximately 95 grams of a white powdery substance that field tested positive for cocaine;

- approximately 6 grams of a white rock substance that field tested positive for cocaine;

- a black digital scale with white residue on top that field tested positive for cocaine;

- one unspent round of .45 caliber ammunition;

- $1,971 in cash; and

- a box of blue nitrile gloves on the kitchen table.

e.  <u>Near the west-facing front door</u>, officers found:

- $155 in cash inside a black bag.

14.   At the time LPD SOS executed the search warrant Jerreka Sherese Rutledge was inside the residence and stated she lives at 5017 Conners Ave. Rutledge was with her infant child. The above listed items including cocaine, crack cocaine, ammunition, US currency cash and a firearm were located throughout the residence including cocaine, a digital scale and US currency cash being located on the same counter as baby formula and baby bottles.

15.   I have learned that Darniko Terry and Jerreka Rutledge have the following criminal history:

a.   Darniko Raynal Terry previously pleaded guilty to 2 counts of Felony Controlled Substance-Del/MFG (Cocaine, heroin or another narcotic) less than 50 grams on April 17, 2019 in the 30th Circuit Court.

     b.    Jerreka Sherese Rutledge previously pleaded guilty to Felony Carrying Concealed Weapon on January 14th, 2020 in the 30th Circuit Court.

16.    I have learned that Darniko Terry and Jerreka Rutledge have the following employment history:

     a.    Darniko Raynal Terry has not been employed since since 2019 per Jerreka Sherese Rutledge.

     b.    Jerreka Sherese Rutledge has not been employed since 2019.

17.    Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

     a.    Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their Devices;

     b.    Laptop computers can be used by narcotic traffickers and drug dealers to store drug ledgers, photographs and other forms of communication including social media, such as Facebook and Instagram.  Laptop computers can also by used by narcotic traffickers to communicate with suppliers, associates, and customers using email services, and they can contain key contact information, such as email addresses and phone numbers, for other members of a drug trafficking organization. Laptop

computers can show search history, travel history, money transfers and other forms of documentation relating to the sale and trafficking of narcotics.

c.      Drug traffickers often use digital scales and nitrile gloves to weigh and package narcotics for distribution;

d.      Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

e.      Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

f.      Drug traffickers often maintain multiple phones in order to disperse the information about their drug contacts across multiple electronic devices; they often use separate devices to contact suppliers, customers, and associates respectively; the contact history, call logs, and text messages in multiple devices typically show the complete picture of a drug traffickers illegal activities. Drug traffickers often keep multiple devices close at hand, even when traveling outside their homes, in order to remain consistently available for communication with suppliers, associates and customers. Drug traffickers will often use flip

phones or "burner" phones which can easily be discarded, switched out or replaced in order to evade law enforcement.

c.  Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business;

d.  Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

e.  User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the Devices is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

f.  Drug traffickers often use the internet to look up various information to support their drug trafficking activities;

g.  Drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns.  Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the

true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their Devices;

h.   It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes electronic records of financial transactions, which are often stored on mobile phones and computers.

i.   When drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

j.    The sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

k.    It is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

m.    That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

n.    Drug traffickers often use services such as Western Union, Moneygram, Venmo, CashApp and others in order to disguise and/or launder their narcotics proceeds and expenditures. The services can be downloaded onto mobile phone and computing devices in the form of Apps. These services can be used to wire money to sources of supply, distributors, and co-conspirators day and night from the devices with anonymity.  However, when downloaded to a phone, these applications often contain records that chronicle transactions performed on that device.

o.      Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

p.      Drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service.

q.      Drug traffickers often use social networking applications such as Facebook and Facebook Messenger to shop for and purchase firearms and ammunition so that they can have weapons on hand to protect their drug supplies and drug proceeds.

## TECHNICAL TERMS

18.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless Devices used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of

capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the Devices.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage Devices designed primarily to store and play audio, video, or photographic files.  However, a

portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS: A GPS navigation Devices uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation Devices can give a user driving or walking directions to another location. These Devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna

can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    PDA: A personal digital assistant, or PDA, is a handheld electronic Devices used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication Devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the Devices.

f.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic Devices that communicate with each other.   Due to the structure of the Internet, connections between Devices on the Internet often cross state and international borders, even when the Devices communicating with each other are in the same state.

19.   Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that Devices 1 through 5 have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation Devices, and/or PDAs. In my training and experience, examining data stored on Devices of this type can uncover, among other things: (1) evidence that reveals or suggests who possessed or used the Devices; (2) evidence of communications regarding the purchase, storage, and distribution of controlled substances; (3) evidence of the purchase, possession, and maintenance of firearms in order to protect drug supplies and drug proceeds; (4) the purchase, storage, and/or distribution location(s) of drugs and/or firearms; (5) the identity and contact information of key personnel within a drug distribution network;

and (6) financial evidence concerning drug proceeds and attempts to launder drug proceeds in order to avoid law enforcement detection.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20.     Based on my knowledge, training, and experience, I know that electronic Devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Devices.  This information can sometimes be recovered with forensics tools.

21.     *Forensic evidence.*    As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a Devices can also indicate who has used or controlled the Devices.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic Devices works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic Devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a Devices was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.*  Because this warrant seeks only permission to examine Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

24.     I submit that this affidavit establishes probable cause that Darneko Terry has violated 18 U.S.C. § 841(a) by distributing and possessing with intent to distribute cocaine, and that he has also violated 18 U.S.C. § 922(g) by possessing firearms and ammunition as a convicted felon.  I further submit there is probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.